**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MOISES MORALES; MONTREAL THOMAS; and JOAQUIN ROCHA on behalf themselves and all similarly situated individuals<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>ADAM MONREAL, in his official capacity as Chairman of the Illinois Prisoner Review Board; S.A. GODINEZ in his official capacity as Director of the Illinois Department of Corrections; and PAT QUINN, in his official capacity as Governor of the State of Illinois,<br><br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)　Case No. 13CV7572<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs MOISES MORALES, MONTREAL THOMAS AND JOAQUIN ROCHA individually and on behalf of all similarly situated individuals, file this complaint against ADAM MONREAL, Chairman of the Illinois Prisoner Review Board, S.A. GODINEZ, Director of the Department of Corrections, and PAT QUINN, Governor of the State of Illinois, and allege as follows:

### INTRODUCTION

1.　　This is a civil rights class action complaint filed on behalf of the men and women who are in the custody of or under the supervision of the Illinois Department of Corrections (hereinafter, the DOC) and who are at risk of imprisonment without adequate due process as a result of the unconstitutional practices and procedures of both the DOC and the Illinois Prisoner Review Board (hereinafter, the PRB) with respect to parole revocation proceedings. The Defendants have developed a fundamentally unfair and procedurally flawed parole revocation

process that violates the Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution, as set forth in *Gagnon v. Scarpelli*, 411 U.S. 778 (1973) and related cases. This court should declare those procedures unlawful and it should enjoin them.

2.      In direct violation of the U.S. Constitution, the Defendants unilaterally refuse to provide attorneys to parolees at any point in the parole revocation process. This is true even if a parolee has a colorable claim that he did not commit an alleged violation, has mitigating evidence explaining why revocation is inappropriate and/or the parolee cannot speak for him or herself. Consequently, parole revocation hearings in Illinois are a sham. The hearing officer (who adjudicates the preliminary parole hearing) and PRB member(s) (who adjudicate the final revocation hearing) preside over faux-hearings that have few of the trappings of due process required before an individual can be imprisoned or otherwise deprived of their liberty. In most instances, the hearing officer and the PRB members merely rubber stamp parole violation reports.

3.      The Defendants conduct over 10,000 of these unlawful hearings each year. The Defendants have, in effect, created a procedural vortex from which people on parole cannot escape. As a result of the Defendants' policies and procedures, the Plaintiffs are continually rotated in and out of the prison system—often as a result of non-criminal technical parole violations, and often based merely on an unsubstantiated accusation that the parolee committed a new criminal offense. The vast majority of parolees in the State of Illinois need and are entitled to appointed counsel to help them navigate these arcane proceedings. Yet, as a matter of practice and procedure, the Defendants systematically deny parolees their right to counsel. They fail to consider whether parolees qualify for the appointment of counsel, at cost to the State, and they fail to appoint counsel to those parolees who do qualify, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

4.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of the Plaintiffs rights as secured by the Fourteenth Amendment to the United States Constitution.

5.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

6.     Moises Morales is a parolee who is currently in the custody of the DOC. He is facing parole revocation because he was arrested on suspicion of domestic violence. Even though all criminal charges against him have been dismissed, the PRB hearing officer found probable cause at his preliminary parole hearing. Mr. Morales is currently awaiting his final revocation hearing. He has a colorable claim that he did not commit the alleged violation, mitigating evidence to justify why he should not be imprisoned, and needs assistance presenting this evidence. Even so, the Defendants failed and will continue to fail to ensure that Mr. Morales is represented by counsel during his parole revocation proceedings.

7.     Montreal Thomas is a parolee who is currently in the custody of the DOC. He is facing parole revocation because he was arrested on suspicion of possession of marijuana. Even though all criminal charges against him have been dismissed, the PRB hearing officer found probable cause at his preliminary parole hearing. Mr. Thomas is currently awaiting his final revocation hearing. He has a colorable claim that he did not commit the alleged violation, mitigating evidence to justify why he should not be imprisoned, and needs assistance presenting

this evidence. Even so, the Defendants failed and will continue to fail to ensure that Mr. Morales is represented by counsel during his parole revocation proceedings.

8.  Jaoquin Rocha is a parolee who is currently in the custody of the DOC. The PRB violated his parole based on allegations that Mr. Rocha committed the violation of Battery and Criminal Trespass. He has a colorable claim that he did not commit the alleged violation, mitigating evidence to justify why he should not be imprisoned, and needs assistance presenting this evidence. Even so, the Defendants failed to ensure that Mr. Rocha was represented by counsel during his parole revocation proceedings.

9.  Defendant Adam Monreal is the Chairman of the Illinois Prisoner Review Board, the State agency that administers parole revocation proceedings. Mr. Monreal supervises the activities of the PRB, and is responsible for implementing the rules, regulations, procedures, and standards governing the parole revocation process in the State of Illinois.

10.  Defendant S.A. Godinez is the Director of the Illinois Department of Corrections, the state agency that is responsible for providing supervision to parolees and for issuing parole violation reports and warrants based on such reports. Until a parolee is discharged from parole, he or she remains in the legal custody of the DOC. When an individual's parole is revoked, that individual is re-imprisoned in the DOC. Mr. Godinez is responsible for implementing the rules, regulations, procedures and standard governing DOC's role in the parole revocation process in the State of Illinois.

11.  Defendant Pat Quinn is the Governor of the State of Illinois and Chief Executive of the state government. As such, Quinn is responsible for the enforcement of State policies by which the rights of the plaintiff class are being violated, as alleged herein. Quinn appointed Mr.

Godinez as Director of the Department of Corrections and Mr. Monreal as Chairman of the Illinois Prisoner Review Board.

## CLASS ALLEGATIONS

12.     The Plaintiffs bring this suit on their own behalf and on behalf of all parolees in the custody of the Illinois Department of Corrections who currently or will in the future face parole revocation proceedings.

13.     The class is so numerous that joinder of all members is impractical. There are approximately 30,000 individuals currently on parole under the supervision of the DOC and the PRB conducted over 10,000 revocation hearings last year. The class also includes many future members whose names are not known, since new people are released from prison and placed on parole each day and the Defendants initiate the parole revocation process frequently in a given week. There are questions of law and fact common to all class members, including but not limited to whether the Defendants' policy and practice of systematically denying appointed counsel to parolees under the supervision of the DOC violates the U.S. Constitution.  Because the practices and procedures challenged in this Complaint apply with equal force to the named Plaintiffs and the other members of the class, the claims of the named Plaintiffs are typical of the class in general.

14.     The named Plaintiffs will fairly and adequately represent the interests of the class. They each possess a strong personal interest in the subject matter of the lawsuit and are represented by experienced counsel with expertise in civil rights litigation. Counsel have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

15.     The Defendants have acted or refused to act on grounds generally applicable to the class: their policies, procedures, practices, acts, and omissions have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

## ALLEGATIONS OF FACT

### Systematic Due Process Violations

16.     Approximately 40% of the population incarcerated in Illinois prisons in 2012 was imprisoned for violating the conditions of their parole. That is, almost half of the prisoners in this State were put behind bars after being charged with violations of the terms and conditions of their parole and subjected to revocation proceedings in which their liberty was rescinded. Because the Defendants fail to implement any system by which parolees may request and obtain counsel at cost to the State, the vast majority of parolees are and continue to be subjected to these proceedings without the assistance of counsel to which many are constitutionally entitled.

17.     Parole revocation proceedings are complex. Fairly conducted, they should involve the presentation of documentary evidence and mitigating circumstances, the cross-examination of witnesses, and oral advocacy. The Defendants lack any mechanism by which a parolee can request an appointed attorney to help him navigate these proceedings. The State categorically denies any request for appointed counsel because no system or funds are in place to secure such an appointment.

18.     The Defendants' policies and practices in this regard directly violate the requirements of due process established in *Gagnon v. Scarpelli*, which held that counsel should be provided in parole revocation cases where, after being informed of his right to request counsel, the parolee makes such a request, "based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that,

6

even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present." 411 U.S. 778, 790 (1973). The Court further held that, in "passing on a request for the appointment of counsel, the responsible agency also should consider, especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself." *Id.* at 790–91. Thus, *Gagnon* affirmed that the right to counsel was "presumptive" in these three categories of cases—where there is a colorable claim the parolee did not commit the violation; where there is substantial evidence in mitigation of the violation, making revocation inappropriate; and where the parolee is incapable of speaking effectively for himself.

19.     A significant percentage of parolees fall within one or more of the *Gagnon* categories. Yet, none receive consideration as to whether they have the right to an attorney and none are appointed counsel in cases that obviously meet the *Gagnon* criteria. The lack of counsel hinders parolees from effectively defending themselves in parole revocation proceedings.

20.     The Defendants have admitted that the state of Illinois has no process through which the state appoints counsel to parolees for whom appointment of counsel is constitutionally required. In an October 2012 response to an Illinois Freedom of Information Act Request ("FOIA"), Defendant PRB's FOIA officer wrote "The Prisoner Review Board does not appoint attorney's (sic) to represent adult inmates or juveniles who are being violated on parole." *See* Oct. 12, 2012 email from K. Tupy to S. Bedi (attached as Exhibit A). Representatives of the PRB and DOC testified under oath at recent depositions that neither agency appoints counsel to

7

parolees in their revocation proceedings.[1] *See* Excerpt from Shunique Joiner Dep. (attached as Exhibit B); Excerpt from Sharon Shipinski Dep. (attached as Exhibit C).

21.     From beginning to end the parole revocation process is byzantine and complex. The parole revocation process is initiated when a DOC employees serves a parolee with a copy of a Parole Revocation Report. At the point of service, a parolee must make two critical decisions: (1) whether to waive, postpone or proceed with a scheduled preliminary revocation hearing, and (2) whether to provide the DOC with a list of witnesses who could testify, either on his behalf or as an adverse witness for purposes of cross-examination, at the preliminary hearing. The forms provided to parolees that are intended to give notice of the charges leveled against them are dense and incomprehensible—the form's complex language and confusing design far exceed the comprehension of the average parolee. If a parolee does not have contact information for witnesses at the precise moment he is served with a parole violation report, or does not immediately grasp the nature of the proceedings and the charges against him, the parolee loses the opportunity to provide witness information to the Defendants. Generally, parolees have fewer than three minutes in which to make the decisions described above. And they must do so without the advice of counsel and without any guidance from the Defendants or their agents.

22.     If a parolee opts to have a preliminary hearing, he or she will face a hearing officer who has access to police reports describing the alleged violations and a number of computerized databases that include information about a parolee's prior arrests, court dates and parole compliance. The Defendants do not provide parolees with either access to the police reports or the information contained in the computerized databases. For the vast majority of parolees, a DOC employee (hereinafter, referred to as a "King investigator," *see* fn. 1) serves as a quasi-prosecutor

---

[1] These depositions were taken in *King v. Walker*, No. 06 C 204 (N.D. Ill), litigation concerning the due process rights of parolees during preliminary parole revocation hearings.

during the preliminary hearing, presenting a summary of the written report of the arresting officer

or supervising parole agent, who do not ever appear at the actual hearing (and are thus not subject

to cross-examination). King investigators also investigate alleged offenses that are not contained

in the parolee's original parole violation report and frequently bring these offenses to the attention

of the hearing officer, even though the parolee does not have notice of these new charges or the

evidence upon which they are based. These preliminary hearings are very brief—the average

hearing lasts less than five minutes—and they are generally route affairs during which probable

cause is almost always found. An examination of 344 representative cases from October 2012 to

July 2013 uncovered only 15 instances (4% of all cases examined) where probable cause was not

found. Counsel are never appointed to represent the parolee at the preliminary hearing, regardless

of individual circumstances.

  23. Once probable cause is found, parolees proceed to a final revocation hearing

before one or more members of the PRB. The final revocation hearing is often held only after the

parolee has been imprisoned for months as a result of the finding of probable cause in the

preliminary hearing. These final hearings are generally a retread of what occurs at the preliminary

hearing—cursory proceedings during which no witnesses are called and no evidence is presented

beyond the written parole violation notice. Again, counsel is never appointed to represent the

parolee, regardless of individual circumstances. As a result, the PRB almost always ratifies the

decision of the hearing officer and keeps parolees imprisoned for a length of time that can vary

from a few additional months to years.

  24. Parolees must defend themselves within this shadowy and complex revocation

system without the assistance of counsel, despite the fact that many parolees meet the

requirements set forth in *Gagnon*, which entitle them to such assistance.

9

25. *First*, many parolees have, at the very least, a colorable claim that they did not commit the alleged parole violation. Parolees frequently are accused of violating parole merely because they have been arrested on suspicion of committing a new criminal offense. Sometimes the arrests themselves are unlawful. More often, these criminal charges are dismissed in a court of law as unfounded. The Defendants policies and procedures allow parolees to be violated and re-imprisoned based solely on the fact that the parolee was subject to arrest—regardless of the merits of the case against him.

26. Similarly, a high percentage of parolees are accused of violating parole on the basis of their parole agent's allegations that they committed a non-criminal technical violation, such as failing to check in with their parole officer. However, the evidence supporting these technical violations is often unreliable. Many of the supervisory functions of the parole system are outsourced to private companies, with insufficient oversight by the DOC or PRB. Further, the computer program that parole agents use to track parolees' compliance with the terms of parole is rife with errors. In addition, parolees have no access to any of this information, and no way to challenge its reliability. The PRB routinely re-imprisons parolees based solely on parole agents' statements that parolees have not complied with the terms of parole.

27. Because the Defendants do not provide parolees with appointed counsel, Plaintiffs are constructively prevented from presenting evidence, either at their preliminary or final parole revocation proceedings, that they did not commit the alleged violation. Without counsel, parolees are denied the opportunity to: (1) have meaningful notice of the charges leveled against them; (2) present evidence, including witnesses, on their own behalf and (3) confront their accusers.

28. *Second*, even in cases where the alleged violation is uncontested, many parolees have substantial reasons mitigating the violation, which, because of the complexity of developing

such evidence, they are incapable of presenting on their own. Parolees are unable to present witnesses who can testify to facts that either justify or mitigate against revocation, or present documentary evidence in their favor. Moreover, they have difficulty developing such evidence in the first place, while they are subject to the conditions of almost constant lock-down in the Northern Reception Center, the maximum security prison where most parolee detainees are initially incarcerated.

29.     Technical violations in particular can often be remediated by an adjustment of the parolee's conditions of parole, without full-scale revocation. Yet, without counsel to aid in the presentation of such mitigation evidence, the hearing officer and PRB systematically fail to take it into consideration.

30.     *Third*, many parolees are unable to speak on their own behalf. Parolees who are under the supervision of the DOC have significantly higher levels of cognitive impairment, educational disabilities, illiteracy, mental health issues and other impairments than is found in the general public, and which make it difficult for such parolees to speak on their own behalf. The mostly recently available DOC data concludes that 38% percent of parolees in Illinois have a sixth grade reading level and that nearly 48% of parolees have not graduated from high school. National data suggests that 36% percent of people held behind bars live with mental illness. As a consequence, these class members are unable to prepare for or effectively defend themselves at their parole hearings without the assistance of counsel.

31.     The systematic and on-going violations described in the preceding paragraphs result in the arbitrary imprisonment of thousands of people in Illinois prisons. People are consistently subjected to months of unreviewable incarceration without process or remedy. As a result of the Defendants' practices and procedures, the members of the Plaintiff class have

suffered and continue to suffer well-established violations of their right to due process under the Fourteenth Amendment of the U.S. Constitution.

## Individual Plaintiff Allegations

**Moises Morales**

32.     An employee of Defendant DOC served Moises Morales with his parole violation report on October 25, 2013. He was alleged to have committed the offense of domestic battery, which was the only parole violation of which he was accused. Upon receiving his Parole Violation Report from the DOC Server, Mr. Morales expressed a great deal of confusion. When he was informed by the DOC server that he needed to decide whether to waive, postpone or proceed with his preliminary hearing, he told her that he could not make a decision because he did not understand the process. The DOC server informed Mr. Morales that he had to make a decision and that she could not help him decide or provide him with any additional information. Mr. Morales repeatedly expressed his confusion and his desire for help to the DOC server. She denied his requests. Eventually, and based on advice from other detainees, Mr. Morales decided to postpone his preliminary hearing until after he went to court for his first appearance on his new charge. Mr. Morales was hopeful that the charge would be dismissed because it was based on an argument he had with his girlfriend. He and his girlfriend had reconciled and she told him that she did not want to press charges against him.

33.     Mr. Morales has a colorable claim that he did not commit the alleged parole violation. Prior to Mr. Morales October 10, 2013 preliminary parole hearing, he appeared in court on his domestic battery charge and the charge was dismissed. His girlfriend, who was the only complaining witness, requested that the charge be dismissed because she felt that she was to blame for the argument that lead to the Mr. Morales' arrest. During Mr. Morales' preliminary

hearing, a King investigator testified based on a conversation she had with the arresting officer, who took a complaint from Mr. Morales' girlfriend moments after the argument. But the Hearing Officer did not review the girlfriend's more recent testimony, which had changed significantly. The Hearing Officer was aware that the charges against Mr. Morales were dismissed, yet she still found probable caused based solely on the fact that Mr. Morales had been arrested.

34.     Mr. Morales lacked the ability to present any evidence of his innocence at his preliminary hearing because he does not have the capacity to call and question his own witness, to cross-examine the arresting officer or DOC employees, or to present his own testimony. Because the hearing officer found probable cause, Mr. Morales remains imprisoned while awaiting his final parole revocation hearing, which has yet to be scheduled.

35.     Mr. Morales also has significant evidence mitigating against revocation. He has made substantial efforts to adhere to the conditions of his parole and become a productive member of society. This one incident is the only time he has been accused of violating the terms of his parole. Indeed, at the time of the alleged violation, Mr. Morales was working two part-time jobs: one at Power Stop, where he was employed as a Quality Control Auditor, and one at Primary Staffing, where he assembled food displays for grocery stores. He received a certificate in advancing youth development from the Chicago Area Project and was in the process of becoming a mentor to at-risk children. He had obtained his GED. This information would demonstrate to PRB members why revocation would be inappropriate in his case. However, without an attorney, Mr. Morales is incapable of presenting this information in a manner that will be fairly considered by the Defendants.

36.     Mr. Morales is at imminent risk of having his due process rights violated at his final revocation hearing. Even though he has both a colorable claim that he has not committed

13

the alleged violation and mitigating evidence suggesting that revocation is inappropriate, the Defendants will not appoint him counsel as required by law.

**Montreal Thomas**

37.     Montreal Thomas was arrested on September 7, 2013, after agents of Defendant DOC performed a routine parole compliance check and visited Mr. Thomas at his approved residence, which was his cousin's home. While searching the residence, the officers found marijuana and, as a result, immediately placed Mr. Thomas in custody.

38.     Mr. Thomas has a colorable claim that he did not commit the alleged parole violation. Mr. Thomas had a preliminary parole hearing on September 25, 2013. At that time, Mr. Thomas attempted to explain to the Hearing Officer that he did not know that the drugs were in the house, that the Parole Violation Report included a number of errors, and that he believed his criminal charges would be dismissed because he did not have personal possession of the drugs. Mr. Thomas' hearing took place at the Cook County Jail and he struggled to speak above the chaos and din of the jail. He was constantly interrupted by the King investigator and was unable to present a comprehensible narrative describing his innocence. The PRB Hearing Officer found probable cause at the preliminary hearing based on the King Investigator's testimony, which pertained only to her interview with the arresting agent and the inaccurate parole violation report.

39.     Mr. Thomas also has significant evidence mitigating against revocation. He has made substantial efforts to become a productive member of society. He has been on parole for two years and has complied with all terms of his parole. He has worked consistently in construction and paid child support for his two children. His continued imprisonment imposes a substantial hardship on his children and their mother. Since his preliminary parole hearing, all

criminal charges against Mr. Thomas were dismissed. Yet, he is still imprisoned while awaiting his final parole revocation hearing, which has yet to be scheduled.

40. Mr. Thomas is at imminent risk of having his due process rights violated at his final revocation hearing. Even though he has both a colorable claim that he has not committed the alleged violation and mitigating evidence suggesting that revocation is inappropriate, the Defendants will not appoint him counsel as required by law.

**Joaquin Rocha**

41. Joaquin Rocha was arrested on July 21, 2013, as a result of an argument with his neighbors. Shortly after the argument ended, the neighbor flagged down the police and told them that Mr. Rocha threatened his child. Based solely on this unsubstantiated allegation, Mr. Rocha was arrested and charged with Battery and Criminal Trespass. Towards the end of July 2013, as a result of this arrest, a DOC server provided Mr. Rocha with a parole violation report. At that time, Mr. Rocha chose to postpone his preliminary parole hearing so he could await the outcome of his first court appearance. Mr. Rocha anticipated that the criminal charges against him would be dismissed.

42. Mr. Rocha has a colorable claim that he did not commit the alleged parole violation. Mr. Rocha's preliminary hearing was scheduled for August 7, 2013 at the Cook County Jail. The Hearing Report or record prepared by the PRB Hearing Officer lists a number of documents that were presented at the hearing and states that probable cause was found in court on his criminal charge. All of this information is entirely false, as the preliminary hearing did not actually occur. The hearing report from that day indicates that there was "no pass for the offender." Thus, Mr. Rocha's scheduled preliminary hearing was postponed without his consent, apparently because the Defendants could not locate Mr. Rocha, who was imprisoned in the Cook

County Jail. In addition, contrary to what was written on the Hearing Report, Mr. Rocha's

criminal charges had actually been dismissed by the court.

43.     Mr. Rocha finally had his preliminary hearing on August 15, 2013. He tried to

explain to the PRB Hearing Officer that his charges had been dismissed. The King investigator

called him a liar and informed the hearing officer that Mr. Rocha had additional pending charges

related to a traffic violation that were not listed in the parole violation report. The PRB Hearing

Officer would not let Mr. Rocha explain his case and he was unable to access the computerized

databases the Hearing Officer and the King investigator were using to gather information about

his alleged violations. Despite the fact that Mr. Rocha's underlying criminal charges were

dismissed, the hearing officer found probable cause.

44.     On Friday, September 20, 2013, Mr. Rocha appeared before the PRB for his final

revocation hearing. The PRB member told Mr. Rocha that if he consented to be violated, Mr.

Rocha would only have to serve another week and then he would be released from prison and

from parole. Mr. Rocha was reluctant to agree to the Board member's suggestion. Mr. Rocha

knew he had a defense to the alleged violation and he did not want to be violated for an offense

he did not commit, but he also knew that he was unable to effectively present a defense or speak

on his own behalf before the PRB member.  After the PRB member repeatedly urged that he

request to be violated, Mr. Rocha did so, on the understanding that he would soon be released

from both prison and parole supervision.

45.     The day before Mr. Rocha was set to be released from prison, the DOC served him

with paperwork informing him that he would not, in fact, be released, either from prison or

parole. Instead, he was to serve an additional 18 months in DOC custody for violating the

conditions of his parole. Mr. Rocha remains imprisoned and has never received an explanation

for this outcome. Even though Mr. Rocha's case was procedurally complicated and even though he had a colorable claim that he did not commit the alleged violation, the Defendants denied him access to appointed counsel. As a result, Mr. Rocha has suffered and will continue to suffer irreparable harm.

## Allegations of a Putative Class Member

46.     G.V. is a parolee who is currently in the custody of the DOC. He takes Risperdal and Trazadone for serious mental illness and he has a difficult time reading documents and comprehending what he has read. He is also unable to communicate in a coherent, intelligible fashion. On June 23, 2013, G.V. was arrested for allegedly pointing a BB gun at an acquaintance in his neighborhood. The police arrested G.V. based solely on the unsubstantiated accusations of this acquaintance.

47.     On July 28, 2013, a DOC sever provided G.V. with a copy of his parole violation report, which alleged that G.V. had violated parole by committing an aggravated assault with a deadly weapon (as a result of the incident with the BB gun) and because he had not made himself available to his parole agent for supervision. G.V. could not understand this paperwork. He tried to read it but it made no sense to him.

48.     G.V. had a colorable claim that he did not commit his alleged criminal violation, which is bolstered by the fact that his criminal charges against him were dismissed on July 5, 2013. Additionally, G.V. has spent much of this parole term in and out of mental health treatment centers. He has hospital records to prove this, which illustrate that his repeated hospitalizations have made it difficult to maintain contact with his parole agent since he could not access the phone while hospitalized. Regardless, at his July 11, 2013, preliminary parole hearing, the PRB Hearing Officer found probable cause that G.V. committed the alleged violation.

49.     At his preliminary parole hearing. G.V. did not understand what was happening and, as a result of his mental health issues, he was unable to speak for himself or describe the evidence he had to prove that he did not commit the alleged violations. During his hearing, the King investigator recited the facts from his parole violation report. G.V. did not have the capacity to subject her to cross-examination. Nor did G.V. have the ability to gather the documents related to his hospitalizations to submit to the PRB hearing officer.

50.     During his final revocation hearing, a PRB member told G.V. he was violated and that he would have to remain imprisoned for the remainder of his parole term. G.V. did not understand that he was attending a final revocation hearing or that he had the right to present evidence on his own behalf during this hearing. Even if he had understood these rights, it would not have affected the outcome of his parolee proceedings. As a result of his mental illness, G.V. lacks the capacity to speak for himself.

51.     Even though G.V. clearly lacked the capacity to effectively speak for and defend himself on the alleged parole violations, the Defendants denied him access to appointed counsel. As a result, G.V. suffers and will continue to suffer irreparable harm.

52.     For as long as each named Plaintiff and putative class members remains on parole in Illinois, they will face an ongoing imminent risk of being subjected to the Defendants' unconstitutional parole procedures.

**COUNT I**
**42 U.S.C. § 1983 Right to Due Process**

53.     The Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

54.     Plaintiffs seek injunctive and declaratory relief against all Defendants to prevent the continued violation of the rights of Plaintiffs and the class they represent.

18

55.     By continuing to conduct parole revocation proceedings in the manner alleged in this Complaint, and specifically, by both failing to consider whether parolees qualify for the appointment of counsel, at cost to the State, and failing to appoint counsel to those parolees who so qualify, Defendants are in continuous violation of Plaintiffs' rights and the rights of the members of the class under the Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class they represent respectfully pray that this Court enter judgment in their favor and against the Defendants in the following manner:

1.     Enter an Order certifying a class of all parolees in the State of Illinois who currently or will in the future face parole revocation proceedings.

2.     Adjudge and declare that the policies, practices, and conduct described in this Complaint are in violation of the rights of Plaintiffs and the class they represent under the Fourteenth Amendment of the United States Constitution.

3.     Preliminary and permanently enjoin the Defendants, their agents, employees, and all persons under their control from subjecting Plaintiffs and the class they represent from the unlawful policies, practices, and conduct described in this Complaint.

4.     Retain jurisdiction of this case until such time as the Defendants have fully complied with all orders of the Court, and there is reasonable assurance that the Defendants will continue to comply in the future with these orders.

5.     Award Plaintiffs reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

6.     Award Plaintiffs and the class they represent such other and further relief as the Court deems just and proper.

Respectfully submitted,

**MOISES MORALES, MONTREAL THOMAS, and JOAQUIN ROCHA, individually, and on behalf of the class of parolees who face parole revocation proceedings in the State of Illinois.**

By:_____/s/___Alexa Van Brunt_____
                Counsel for the Plaintiffs

Alexa Van Brunt
Sheila A. Bedi (*Pro hac vice* motion to be filed)
Roderick and Solange MacArthur Justice Center
Northwestern University School of Law
357 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-1336

Alan Mills
Uptown People's Law Center
4413 North Sheridan
Chicago, Illinois 60640
(773)769-1411

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that she served the foregoing document via the

Court's CM/ECF system on October 22, 2013.

_____/s/___ Alexa Van Brunt___